**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**HEIMERL LAW FIRM**
Wolfgang Heimerl, Esq. (WH-5192)
110 Wall Street, 11th Floor
New York, New York 10005
Tel. (212) 709-8370

Attorneys for Plaintiffs
 **GS EQUITIES, LTD., and EROSTRA, LLC**



| | |
|---|---|
| **GS EQUITIES, LTD, and EROSTRA, LLC,** | |
| **Plaintiffs,** | CIVIL ACTION NO. 08-__ ( ) |
| vs. | **COMPLAINT** |
| **BLAIR RYAN CO., JAY PELSINGER, FRED PELSINGER and LEONIDES GUADARRAMA,** | |
| **Defendants.** | |

Plaintiffs, GS Equities, Ltd. and Erostra, LLC, by way of Complaint against defendants, Blair Ryan Co., Jay Pelsinger, Fred Pelsinger and Leonides Guadarrama state as follows:

**THE PARTIES**

1.  Plaintiff GS Equities, Ltd. ("GS") is a corporation organized and existing pursuant to the laws of the State of New York which maintains its principal offices located in the State of New York.

2.  Plaintiff Erostra, LLC ("Erostra" and together with GS, the "Plaintiffs") is a limited liability company organized and existing  pursuant to the laws of the State of Delaware with its principal offices located in the State of New York.

3.  Upon information and belief, defendant Blair Ryan. Co. ("BR") is a corporation organized

and existing pursuant to the laws of the State of Florida with its principal offices located in the State of Florida.

4.    Upon information and belief, defendant Jay Pelsinger ("JP")is a resident of the State of Florida.

5.    Upon information and belief, defendant Fred Pelsinger ("FP")is a resident of the State of Texas.

6.    Upon information and belief, Leonides Guadarrama ("LG") is a resident of Mexico.

## JURISDICTION AND VENUE

7.    Inasmuch as complete diversity exists among the plaintiff and all defendants, and the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional requirement, jurisdiction is appropriate pursuant to *28 U.S.C. § 1332*. Plaintiffs maintain their principal places of business in the State of New York. Accordingly, venue in this Court is appropriate pursuant to *28 U.S.C. § 1391(a)*.

## THE UNDERLYING FACTS

8.    Plaintiffs are in the business of the marketing and distribution of, among other things, herbal supplements.

9.    On or about July 25, 2005 and November 22, 2006,GS and BR entered into two separate Distribution Contracts (the "Contracts"). Copies of the Contracts are collectively annexed as Exhibit A.

10.    Under the terms of the Contracts BR provided to GS exclusive distribution rights to certain products.

11. Each of the Contracts contains a warranty and representation that "the Products contain and at all times will contain all natural ingredients" and will comply with all FDA regulations.

12. Plaintiffs expended significant time and expense in reliance upon the representations set forth in the Contracts.

13. JP and FP, individually and on behalf of BR, represented, in order to induce GS to enter into the Contracts, that the products set forth in the Contracts contained only natural ingredients and complied with all FDA regulations.

14. Had defendants not made the representations set forth in the Contracts, and as set forth in paragraph 13 above, GS would not have entered into the Contracts and Erostra would not have devoted any time and/or effort in marketing and establishing distribution channels for the products.

15. Additionally, GS advanced funds to BR in order to have required product testing by United States based laboratories.

16. The laboratory tests revealed that the products were "spiked" and contained certain ingredients which were not "all natural".

17. Upon information and belief, BR failed to obtain any required FDA approvals for the products in question.

18. BR's failure to provide products in conformance with the Contracts is a clear breech of each of the Contracts

19. Upon information and belief, BR, JP and FP, in concert with LG conspired to import products, which clearly did not meet FDA regulations, into the United States for later distribution

by LG in Mexico.

## COUNT I
### (Breach of Contract)

20. Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 19 above as if set forth at length herein.

21. BR has materially breached the Contracts by its failure to provided any product in accordance with the Contracts.

22. As a result of BR's breach of the Contracts, Plaintiffs have suffered damages in excess of $1,000,000.00

**WHEREFORE**, Plaintiffs respectfully demand Judgment against BR as follows:

(A) For compensatory damages in an amount to be proven at trial;

(B) For consequential damages in an amount to be proven at trial;

(C) For an award of plaintiffs' costs of this action;

(D) For plaintiffs' attorneys' fees; and

(E) For such other, further or different relief as this Court may deem proper, just and appropriate.

## COUNT II
### (Breach of Covenant of Good Faith and Fair Dealing)

23. Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 22 above as if set forth at length herein.

24. During the times when the Contracts were being negotiated, BR, JP and FP represented

that BR could, and would, be able to produce product in accordance with the Contracts.

25.    Upon information and belief, BR, JP and FP had full knowledge that BR was unable to produce product in accordance with the Contracts.

26.    As a result of BR's breach of the Agreement, Plaintiffs have suffered damages in excess of $1,000,000.00

**WHEREFORE**, Plaintiffs respectfully demands Judgment against BR as follows:

(A) For compensatory damages in an amount to be proven at trial;

(B) For consequential damages in an amount to be proven at trial;

(C) For an award of plaintiffs' costs of this action;

(D) For plaintiffs' attorneys' fees; and

(E) For such other, further or different relief as this Court  may deem proper, just and appropriate.

## COUNT III
### (Fraud and Fraud in the Inducement)

27.   Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 26 above as if set forth at length herein.

28.   Absent the representations of BR, JP and FP, GS would not have entered into the Contracts.

29.   Following the execution of the Contracts, BR, JP and FP continued to make

representations that BR could. and would, produce products in conformity with the Contracts.

30. Upon information and belief. BR, JP and FP knew their statements to be material false. misleading and were made only for the purpose of inducing GS to enter into, and perform under, the Contracts.

31. Plaintiffs relied upon the knowingly false representations of BR. JP and FP to their detriment.

32. As a result of the actions of BR, JP and FP, plaintiffs have suffered damages in excess of $1,000.000.

WHEREFORE. plaintiffs respectfully demand Judgment against BR. JP and FP. jointly and severally. as follows:

(A) For compensatory damages in an amount to be proven at trial;

(B) For consequential damages in an amount to be proven at trial;

(C) For an award of plaintiffs' costs of this action;

(D) For plaintiffs' attorneys' fees; and

(E) For such other. further or different relief as this Court may deem proper. just and appropriate.

## COUNT IV
### (Conversion)

33. Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 32 as if set forth at length herein.

34. Plaintiffs advanced monies to BR and/or JP and FP. with the express understanding that such sums were to promptly be repaid. in order to obtain laboratory testing of the products at issue in the United States.

35. BR. and/or JP and FP have failed and refused to repay all of the monies advanced and

have, upon information and belief, converted such sums, without the consent of plaintiffs, for their own use and benefit.

36.  As a result of the actions of BR and/or JP and FP, plaintiffs have suffer damages in excess of $20,000.

WHEREFORE, plaintiffs respectfully demand Judgment against BR, JP and FP, jointly and severally, as follows:

(A) For an amount of the total funds converted by defendants for their own use and benefit;

(B) For an award of plaintiffs' costs of this action;

(C) For plaintiffs' attorneys' fees; and

(D) For such other, further or different relief as the Court may deem proper, just and appropriate.

## COUNT V
## (RICO)

37.    Plaintiffs repeat and incorporate by reference each and every allegation set for in paragraphs 1 through 36 above as if set forth at length herein.

38. Upon information and belief, BR, JP, FP and LG conspired as one enterprise to violate the regulations of the FDA by the importation, into the United States, of products which did not conform with FDA regulations.

39. Defendants represented, orally, and in the Contracts, that the products complied with all FDA regulations.

40. Upon information and belief, the defendants were aware that the products did not meet all FDA regulations.

41. Upon information and belief, defendants knowing violations of FDA regulations were done, in part, in order to induce plaintiffs to enter into the Contracts upon the reliance that product was then being shipped, and could legally be shipped, into the United States.

42. Plaintiffs have been damaged as a result of defendants' criminal conspiracy.

WHEREFORE, plaintiffs respectfully demand Judgment against all defendants, jointly and severally, as follows:

(A) For compensatory damages in an amount to be proven at trial;

(B) For consequential damages in an amount to be proven at trial;

(C) For an award of plaintiffs' costs in this action;

(D) For plaintiffs' attorneys' fees;

(E) For such other, further or different relief as the Court may deem proper, just and appropriate.

Dated: November 2, 2007

**HEIMERL LAW FIRM**
Attorney for Plaintiffs

By: _____
       Wolfgang Heimerl, Esq.

EXHIBIT A

# DISTRIBUTION CONTRACT

This is a contract between **Blair Ryan Co.** , 7321 N.W. 18th Street, Suite 201, Margate, Florida 33063 (hereinafter "Supplier") and GS Equities Ltd. 5 Westchester Plaza Elmsford, New York 10523 USA (hereinafter "Distributor").

### Scope:

The following will confirm our agreement with respect to GS Equities, Inc. and its assignees ("Distributor") acting as the sole and exclusive Distributor of the products ("Products") listed on Exhibit A hereto in the territories listed on Exhibit B hereto ("Territories") on the terms and conditions set forth herein.

1. The Distributor is hereby appointed as the sole and exclusive Distributor of the Products in the Territories.
2. The Supplier hereby represents, warrants and covenants with and to Distributor as follows:

(a) Supplier has the full power and authority to enter into this Agreement and the execution, delivery and performance hereof does not create a breach of or conflict with any agreement to which the Supplier is the party or by which it is bound.

(b) The Agreement has been duly and validly executed and delivered by Supplier and is a valid and binding agreement of Supplier enforceable in accordance with its terms.

(c) The Products contain and at all times will contain all natural ingredients, and will be properly labeled in accordance with applicable law (including serving sizes, ingredient percentages and other applicable requirements); Supplier will obtain and comply with all necessary United States and other governmental customs, rules and regulations and all rules and regulations of the Food and Drug Administration ("FDA"); the Products will not contain any ingredients such that the Products will be subject to regulation by the FDA or viewed as having any pharmaceutical content. Supplier will immediately provide written notice to Distributor of any claim or investigation by any governmental authority with respect thereto or in any other way related to the Products.

(d) Supplier has or within 30 days after the execution hereof, provided to Distributor true and correct copies of the following documents: (i) a complete listing and breakdown of all ingredients comprising the Products together with a full and complete analysis with respect to each Product; (ii) a certified statement from the Suppliers that the Products do not contain or use any improper ingredients under United States law and comply with all United States laws and regulations and of the other Territories; (iiA) a statement that, to the best of supplier knowledge, all ingredients contained in the Products will not cause allergies to large percentage of the population; (iii) documentation satisfactory that the production of the Products does not use any chemicals or contain any chemical residue which would be in violation of any third party patent; (iv) copies of a shelf-life stability report with respect to each of the Products; (v) all assay reports as shall have been requested by Distributor with respect to the Products; (vi) copies of all agreements between Supplier and any factory or manufacturer of the Products; (vii) any licenses, permits or other

Blair Ryan Co.
July 21, 2005
Page 2

governmental documentation related to the Products; (viii) all studies, marketing or scientific reports and other materials of a similar nature related to the Products.

(e) Distribution of the Products by Distributor to its customers in the Territories pursuant to the terms hereof will not violate any applicable law or regulation of any Territory.

(f) All agreements between Supplier and its manufacturers are in full force and effect and there is no default there under nor will any default be caused as a result of this Agreement. The sole record and beneficial owner of Supplier is Jay Pelsinger. Fred Pelsinger is owner of FPC International Inc. Jay Pelsinger shall provide such assistance to Distributor as it shall reasonably request from time to time in connection with its distribution and marketing activities contemplated hereby, and in the event of the death or disability of Jay Pelsinger, Fred Pelsinger shall provide such assistance.

## Products:

This contract hereby appoints and authorizes Distributor to sell, market and distribute products as specified in Exhibit A to this contract in its exclusive territory.

## Prices:

The initial price for the products shall include blister packs with at least a 4-color box with explanatory product insert description and product disclaimers (see Exhibit A for full product specifications) delivered to Distributors Elmsford office or a warehouse designated by Distributor. Prices for the quantities ordered are set forth in Exhibit C are annexed hereto. Supplier shall use any packaging requested by Distributor from time to time for the Products. All shipping, taxes and customs duties with respect to the Products until delivered to Distributor's designated facility shall be the sole responsibility of Supplier. All prices set forth herein are and will be the best price offered in each or kind, directly or indirectly to any other distributor in the world for the respective volume bracket pricing as per Exhibit C. Thereafter, any changes in price of the Products shall be mutually agreed upon provided however that any increase in price due to acts of God or other actions beyond the control of Supplier shall be subject to satisfactory evidence or other documentation requested by Distributor to be provided to Distributor within 5 business days.

## Support:

a) Supplier shall provide sales aids and technical assistance as the supplier deems necessary to achieve the designated performance standards including the providing of fully boxed samples in accordance with Distributor specifications accompanying each order in an amount equal to 3% of such order.

b) Upon receipt of a direct inquiry from a potential or existing customer in the specified territory, Supplier shall direct any such customer to the Distributor.

c) Supplier shall not sell to any entity or directly in Distributor's territory. If Supplier sells to a customer in Distributor's territory, or directly to the public in Distributor's territory, the Supplier shall pay a penalty not to exceed 150% of the gross sales that Distributor would otherwise have been entitled to plus any consequential damages.

Blair Ryan Co.
July 21, 2005
Page 3

 d) In furtherance of any other provision herein, Supplier covenants and agrees with Distributor that it shall not sell, assign or transfer directly or indirectly, any control over, whether by sale of equity or assets or otherwise any rights of Distributor hereunder without the consent of Distributor and provided further that any such sale, assignment or transfer permitted hereunder shall expressly provide that any assignee or transferee of Supplier shall continue to provide Products to Distributor on the terms and conditions set forth herein.

 e) Supplier warrants that all Products will at all times meet the standards and criteria set forth on Exhibit D annexed hereto. In the event that any Product is not compliant with such specifications, is recalled or is otherwise defective, Supplier shall promptly replace such Products or shall otherwise make adjustment to any outstanding amount due to Supplier from Distributor as mutually agreed upon. Supplier shall provide such technical Product support during the term of this Agreement as Distributor may reasonably request.

 f) Supplier covenants and agrees that all times during the continuation of this Agreement, it shall maintain general liability, product liability and such other insurance as may be requested by Distributor, in such amounts and with such insurance companies as are reasonably satisfactory to Distributor. Supplier shall provide certificates of insurance or other evidence satisfactory to Supplier of its compliance with the insurance requirements hereof and shall cause Distributor to be a named insured under such policies. Such policies may not be cancelled or materially modified without sixty days' prior notice to Distributor. Distributor will also maintain additional liability insurance.

## Performance Standards:

Distributor agrees and warrants that they will purchase in an initial order 10,000 packaged units containing minimum 3 (three), blister packs per package. After 60 to 90 days upon receipt of product, parties agree to determine the applicable standard for the first year. The parties agree to determine the applicable standard 60 days prior to the end of the current year for the next year. However, the minimum increase to be 20% of the first years standard and each subsequent year there will be a 20% minimum increase over the prior years minimum standard.

Distributor shall act to further the best image of the Supplier and Manufacturer and at no time shall the Distributor do, cause, or permit any act, or divulge, publish, or declare any information, which is or may be construed as detrimental to the best interests or business reputation of the Supplier or Manufacturer.

Distributor shall market actively and sell the products in the territory and provide advisory and support services to Distributor's customers sufficient to make possible success in the territory. Within a reasonable time, subject to the governing laws and requirements, Distributor shall finalize and obtain all necessary licenses necessary to complete its requirements under this contractual agreement.

Supplier shall provide to Distributor copies of any laboratory reports in Supplier's possession that describe the nature and quality of the product and shall provide new or updated lab reports each six months throughout the term of this agreement.

Supplier shall not do, cause, or permit any act, or divulge, publish, or declare any information, which is or may be construed as detrimental to the best interests or business reputation of the Distributor. This provision survives termination of this contract for any reason.

Blair Ryan Co.
July 21, 2005
Page 4

## Distributor's Purchase Orders:

All Products ordered by Distributor hereunder shall be delivered to such location as Distributor designates to Supplier no more than 30 days following confirmation of the order and confirmation of receipt by Supplier of letter of credit and Supplier will immediately notify Distributor that Supplier is in receipt of letter of credit. In addition to any other rights or remedies available to Distributor hereunder or otherwise, in the event that Supplier fails to deliver Products within such time period it shall pay to Distributor an amount equal to 5% of the applicable order, for every 5 day period in excess of such 30 day period that it fails to deliver the Products. Supplier represents and warrants to Distributor that it has the capacity and ability to fulfill all orders of Products placed by Distributor. Payment for Products shall be made pursuant to a letter of credit in form and substance mutually satisfactory to the parties which letter of credit shall provide among other things that the letter of credit may be drawn only upon delivery of the Products ordered to Distributor in compliance with all applicable laws to the warehouse or other facility designated by Distributor.

## Payment:

Confirmed letter of credit payable at site.

## Damaged Product

Upon delivery of product to Distributor's warehouse, Supplier shall make full inspection of delivered product. Distributor shall notify Supplier in writing of any damages or shortages of delivery of order. In the event of damages and or shortages of order, Supplier shall credit Distributor for such damages/shortages. Credit shall be in cash reimbursement or credit for future orders.

## Term of Contract:

The term of this Agreement shall continue for a period of three years following the execution and delivery hereof and shall continue thereafter for a consecutive three-year terms unless sooner terminated in accordance with the terms hereof. This Agreement may be terminated by either party upon the material default of the other party unless such default is cured within thirty days after written notice thereof is received by such defaulting party. In the event of the bankruptcy, insolvency or other similar occurrence by either party, this Agreement may be terminated by the other party unless such event is stayed or dismissed within sixty days following the occurrence thereof.

## Termination:

Blair Ryan Co.
July 21, 2005
Page 5

In addition to the foregoing, the parties may terminate this agreement as follows:

By Distributor:

- Distributor may terminate this contract at any time upon the occurrence of any one of the following enumerated events:
  a) Supplier and/or Manufacturer is unable to make timely, adequate shipments of product.
  b) Supplier and/or Manufacturer is unable to supply product of sufficient quality such that product is rendered unmarketable.
  c) However, if Supplier is supplying other territories with the same products in sufficient supply and quantity, then Distributor shall be entitled to specific performance to deliver or to go directly to manufacturer if supplier refuses to supply.

By Supplier:

- Supplier may terminate this contract at any time following the giving of 30 days written notice to distributor upon the occurrence of any one of the following enumerated events:
  a) Distributor fails to perform any material obligations under this contract.
  b) Distributor fails to correct a default within 30 days of written notice of default sent by Supplier, unless because of circumstances beyond Distributor's control, distribution needs additional time, e.g. change of laws in the territory or challenge of product itself etc.
  c) Distributor fails to meet performance standards as enumerated herein.
  d) Distributor willingly and directly markets, sells, or distributes Supplier's product outside of the agreed territory.

**Right of First Refusal**

At any time that Supplier shall wish to accept an offer made by a third party for the purchase of Supplier's business, then Supplier shall give Distributor written notice of the offer and terms of payment and a copy of any proposed contract (with the proposed purchaser's name and contact information redacted) that reflects the terms of the offer. Distributor shall then have an irrevocable option for a period of thirty days after actual receipt of the notice, to purchase Supplier's business on the same terms as stated in the notice and contract.

This Right of First Refusal shall be considered validly exercised when the Distributor sends to Supplier a written notice of intent to exercise this Right of First Refusal by certified mail, return receipt requested within the thirty-day period called for above accompanied by any consideration tendered by the proposed buyer with the contract. If Distributor fails to exercise or refuses to exercise this right during the above period, Supplier may finalize the sale, exchange or other disposition to a third person or persons on the terms and conditions specified in the written notice sent to Distributor free of any rights of Distributor. However, Supplier must provide that the new Supplier adhere strictly to the terms of the Distributors agreement so as not to diminish in anyway-directly or indirectly-Distributor's rights or investment.

**Severability:**

Invalidation of one provision of this contract does not invalidate the whole contract; rather, the remaining clauses shall survive intact.

**Jurisdiction and Venue:**

Blair Ryan Co.
July 21, 2005
Page 6

Delaware Law.

## Alternative Dispute Resolution:

Distributor and Supplier both agree to submit any and all unresolved disputes first to mediation in the specified jurisdiction and venue, and if the results of such mediation are unsuccessful, then the parties agree to submit their claims to binding arbitration in Wilmington, Delaware according to the rules of the American Arbitration Association. Supplier and Distributor shall each appoint one arbitrator and the two arbitrators will agree to appoint a third arbitrator. Either party can commence arbitration if mediation is unsuccessful.

## Completeness:

Both parties warrant and agree that this contract and as it may subsequently be amended as provided below is the sole and exclusive embodiment of the agreement between the parties.

## Modification/Amendments:

Any and all modifications or amendments to this agreement shall be in writing and signed by both parties. No oral modifications are effective or enforceable by or against either party. Modifications and amendments may be executed via facsimile transmission or similar electronic transmission means.

## Counterparts:

This agreement and any written modification thereof may be executed in counterparts, each of which shall have the full force of an original.

## Force Majeure:

Neither Supplier nor Distributor shall be liable to the other for any failure to perform any obligation under this contract due acts of government, civil authority, strike or acts of God. The party claiming relief under this subsection shall give prompt written notice to the other party. The remedy for such an event, except as otherwise provided herein, is not termination of the contract, but rather the contract shall be extended by an amount time equal to the length of delay attributable to such occurrence.

## Additional Items

Attached hereto is a true and complete copy of the commercial contract by and between Supplier and Xi'an Jinguishou Pharmaceutical Factory No. 42 ("Xi'an") dated May 27, 2005 which agreement is in full force and effect. Supplier shall promptly provide to Distributor copies of any amendment to such agreement Supplier represents, warrants and covenants to Distributor that such agreement (as the same may be amended from time to time) will not be violated by the execution and delivery hereof and that no

Blair Ryan Co.
July 21, 2005
Page 7

consent of Xi'an is required in connection with the execution and delivery hereof and that Supplier has full power and authority to grant to Distributor the rights granted to it hereunder.

In the event that Supplier elects by written notice thereof to Distributor to use or co-brand with any trademark, packaging or other branding materials of Distributor, the parties shall use their best commercial efforts to enter into a mutually agreeable licensing and cross-branding agreement with respect thereto as promptly as practicable after the receipt of Supplier's notice to Distributor; provided, however that Supplier may not use any trademark or other materials of Distributor unless and until such license agreement is entered into.

This contract permits Distributor to market and accept orders of Supplier's products, for distribution and ultimate sale ONLY in the aforementioned territory. Supplier shall be entitled to 150% of gross sales plus any consequential damages should Distributor sell, distribute or market Supplier's products outside of the agreed territory or should Distributor, directly permit any of its customers to do so, excluding territories controlled by Distributor or affiliates.

All notices or other communications required or permitted to be given hereunder or contemplated hereby shall be in writing and shall be given to the other party at its address set forth below either by hand delivery, facsimile or recognized national overnight courier service;

> If to Supplier, to;
> Blair Ryan Co.
> 7321 N.W. 18 Street
> Suite 201
> Margate, Florida 33063
>
> If to Distributor, to;
> Gary Spirer
> GS Equities
> 161 W. 61st Street, Apt 23E
> New York, New York 10023

Supplier shall cause the full cancellation and termination of that certain Distribution Agreement by and between Supplier and Kerry Kirk or his affiliates on or before September 30, 2005. Supplier will provide a copy of such termination agreement with Kirk and/or his affiliates for sale of Suppliers products in the Distributor's Territory. Upon Distributor's confirmation of initial purchase order and payment, Kerry Kirk will cease from selling any remaining inventory and all customers Kerry Kirk has sold to or communicated with will be released to Distributor. Kerry Kirk will sign an agreement with G.S. Equities enumerating these terms. In the event that said agreement is not cancelled without any recourse directly or indirectly to Distributor, Distributor shall have the right to terminate this Agreement without any liability to Distributor.

Each party agrees to cooperate fully with the other in connection with the matters contemplated hereby and to execute and deliver, and take all such other actions as may be reasonably necessary to further implement the terms of this Agreement. In furtherance thereof, Supplier shall do all things as may be reasonably necessary or requested by Distributor to further the purposes hereof including but not limited

Blair Ryan Co.
July 21, 2005
Page 8

to cooperating with or making any necessary applications to any applicable governmental authority in obtaining any permits or other approvals required thereby.

Supplier shall promptly notify Distributor upon receipt of notice or other information which should reasonably lead Supplier to conclude that any manufacturer of Products has suffered any interruption in production, has entered into a merger, sale or other distribution of its assets or equity, any rule or regulation has become applicable preventing or impeding the delivery of Products to or within any of the Territories or any other fact or circumstance which could reasonably be expected to adversely affect the rights of Distributor hereunder.

This Agreement may not be assigned or delegated by either party except that Distributor shall have the right to assign its rights and obligations hereunder in whole or in part.

This Agreement may be executed in counterparts, all of which when taken together shall be deemed one original. This Agreement may only be amended or modified by written instrument executed by each of the parties hereto.

If the foregoing accurately reflects your understanding, kindly execute this Agreement where indicated whereupon it will become a binding agreement between us.

GS EQUITIES, INC.

By: _____
Name:
Title: President

AGREED TO:

BLAIR RYAN CO., INC.

By: _____
Name:
Title: PRESIDENT

## Exhibit A
### Products

As used in this Agreement, "Products" means any combination of existing or newly developed ingredients, singly or in combination, in any format now or in the future and any state or medium such as frozen, freeze dried, liquid, gas or solids including granular, pills, tablets or liquids on account of any (1) sexual or energy enhancement products including but not limited to Jinshenkang Products (3-gram pills, granules), Herbal Zisen Products (tablets, capsules), (2) arthritis including but not limited to Gubirong Products, capsules, pills for Arthritis etc.

### Specifications

## Exhibit B
### Territory

Distributor is hereby granted the exclusive right to market, sell and distribute in any manner whatsoever any of the Products now or hereafter developed in the following territories: United States, United States possessions and territories.

## Exhibit C Pricing TO DISTRIBUTION CONTRACT

| Quantity | Jinshenkang Granule | Jinshenkang Pills | 3g/pc |
|---|---|---|---|
| 49,999pcs or less | USD1.48/pc | | USD0.90/pc |
| 50,000pcs to 99,999pcs | USD1.42/pc | | USD0.87/pc |
| 100,000pcs to 199,999pcs | USD1.36pc | | USD0.84pc |
| 200,000pcs to 999,999pcs | USD1.30/pc | | USD0.81/pc |
| 1,000,000pcs or more | USD0.1.18/pc | | USD0.78/pc |

## Herbal Zisen Tablets

| Quantity | Price 2/Tablets/Blister Pack | |
|---|---|---|
| | 2 Blister Packs | 3 Blister Packs |
| 49,999pcs or less | USD2.76/pc | USD3.96pc |
| 50,000 to 99,999pcs | USD2.72/pc | USD3.92/pc |
| 100,000 to 199,999pcs | USD2.68/pc | USD3.88/pc |
| 200,000 to 999,999pcs | USD2.64/pc | USD3.84/pc |

ALL PRICES ARE BASED ON ORDERS OF MINIMUM 10,000 PIECES.

ORDERS LESS THAN 10,000 PIECES, ADD 10% TO PRICES INDICATED.

PRICES INDICATED – HERBAL ZISEN TABLETS BOX INCLUDED.
3g PILLS/10G GRANULES NO BOX INCLUDED

**Exhibit D**
**Standards and Criteria**

## ADDENDUM TO DISTRIBUTION CONTRACT

In reference to Contractual Agreement signed on December 8, 2005, between Blair Ryan Co., 7321 N.W. 18th Street, Suite 201, Margate, Florida, 33063 and GS Equities Ltd., 161 W. 61st Street, Suite 23E, New York, New York 10023, covering territory of Canada, which for good and valuable consideration, is hereby amended as follows:

1) The initial Contractual Agreement will be extended for a period of Five, (5) years commencing on November 22, 2006 and shall expire on November 21, 2011; provided however that the Agreement shall thereafter automatically renew for five (5) year periods, unless the Agreement is otherwise earlier terminated in accordance with its terms.

2) The Territory (as defined in the Agreement) shall be exclusive worldwide with exception of the following territories:

    a.  Mexico
    b.  South America
    c.  Central America
    d.  France
    e.  Italy
    f.  Spain

3) Erostra™ trademark brand is owned by GS Equities Ltd. and its assignee Erostra™, LLC.

4) Except as otherwise hereby modified, the Agreement remains in full force and in effect without modification.

AGREED TO:


Blair Ryan Co.                                          GS Equities Ltd.

By: _____                By: _____ 1/27/07
  Name:                                                  Name:
  Title:                                                    Title: President

Date: January 12, 2007

## DISTRIBUTION CONTRACT

AGREEMENT dated as of November 22, 2006 between **Blair Ryan Co.** 7321 N.W. 18th Street, Suite 201, Margate, Florida 33063 USA (hereinafter "Supplier") and GS Equities Ltd. 161 W. 61st St. Suite 23E, New York 10023 USA (hereinafter "Distributor").

WHEREAS, the parties are desirous of entering into an agreement with respect to Distributor acting as the sole and exclusive Distributor of the products ("Products") listed on Exhibit A hereto in the territories listed on Exhibit B hereto ("Territories") on the terms and conditions set forth herein.

NOW, THEREFORE, the parties hereto hereby agree as follows:

A.    **Scope.**

The Distributor is hereby appointed as the sole and exclusive Distributor of the Products in the Territories.

B.    **Representations.**

The Supplier hereby represents, warrants and covenants with and to Distributor as follows:

1.    Supplier has the full power and authority to enter into this Agreement and the execution, delivery and performance hereof does not create a breach of or conflict with any agreement to which the Supplier is a party or by which it is bound.

2.    The Agreement has been duly and validly executed and delivered by Supplier and is a valid and binding agreement of Supplier enforceable in accordance with its terms.

3.    The Products contain and at all times will contain all natural ingredients, and will be properly labeled in accordance with applicable law (including serving sizes, ingredient percentages and other applicable requirements, if necessary); Supplier will obtain and comply with all necessary United States and any other governmental customs, rules and regulations where the Products will at any time be distributed, including but not limited to all rules and regulations of the United States Food and Drug Administration ("FDA"); the Products will not contain any ingredients such that the Products will be subject to regulation by the FDA or viewed as having any pharmaceutical content.    Supplier will immediately provide written notice to Distributor of any claim or investigation by any governmental authority with respect thereto or in any other way related to the Products.

4.    Supplier has or within 30 days after the execution hereof, shall provide to Distributor true and correct copies of the following documents: (i) a complete listing and

breakdown of all ingredients comprising the Products together with a full and complete analysis with respect to each Product; (ii) a certified statement from the Suppliers that the Products do not contain or use any improper ingredients under [any applicable] law and comply with [any applicable] laws and regulations and of [any applicable jurisdiction]; (iiA) a statement that, to the best of Supplier's knowledge after due inquiry [all ingredients contained in the Products will not cause allergies to large percentages of the population]; (iii) documentation satisfactory to the Supplier that the production of the Products does not use any chemicals or contain any chemical residue which would be in violation of any third party patent; (iv) copies of a shelf-life stability report with respect to each of the Products; (v) all assay reports as shall have been requested by Distributor with respect to the Products; (vi) copies of all agreements between Supplier and any factory or manufacturer of the Products; (vii) any licenses, permits or other governmental documentation related to the Products; (viii) all studies, marketing or scientific reports and other materials of a similar nature related to the Products. The term of this agreement will be extended for the time period that it takes for information under this paragraph to be supplied and for any government to grant approval sale or distribution in such jurisdiction of the Products.

5.    Distribution of the Products by Distributor to its customers in the Territories pursuant to the terms hereof will not violate any applicable law or regulation of any Territory.

6.    All agreements between Supplier and its manufacturers are in full force and effect and there is no default there under nor will any default be caused as a result of this Agreement. The sole record and beneficial owner of Supplier is Jay Pelsinger. Fred Pelsinger is owner of FPC International Inc. Jay Pelsinger shall provide such assistance to Distributor as it shall reasonably request from time to time in connection with its distribution and marketing activities contemplated hereby, and in the event of the death or disability of Jay Pelsinger, Fred Pelsinger shall provide such assistance.

C.    **Prices.**

Products will be (see Exhibit A for full product specifications) delivered to Distributor's warehouses designated by Distributor. Delivered prices for the quantities ordered are set forth in Exhibit C are annexed hereto. Supplier shall use any packaging requested by Distributor from time to time for the Products. All shipping, taxes and customs duties with respect to the Products until delivered to Distributor's designated facility shall be the sole responsibility of Supplier. All prices set forth herein are and will be the best price offered in each or kind, directly or indirectly to any other distributor in the world for the respective volume bracket pricing as per Exhibit C. Thereafter, any changes in price of the Products shall be mutually agreed upon provided however that any increase in price due to acts of God or other actions beyond the control of Supplier shall be subject to satisfactory evidence or other documentation requested by Distributor to be provided to Distributor within 5 business days.

D.    **Support.**

1.    Supplier shall provide technical assistance as the Distributor deems necessary to achieve the designated performance standards.

2.    Upon receipt of a direct inquiry from a potential or existing customer in the specified territory, Supplier shall direct any such customer to the Distributor.

3.    Supplier shall not sell to any entity or directly in Distributor's territory.    If Supplier sells to a customer in Distributor's territory, or directly to the public in Distributor's territory, the Supplier shall pay a penalty not to exceed 150% of the gross sales that Distributor would otherwise have been entitled to plus any consequential damages.

4.    In furtherance of any other provision herein, Supplier covenants and agrees with Distributor that it shall not sell, assign or transfer directly or indirectly, any control over, whether by sale of equity or assets or otherwise any rights of Distributor hereunder without the consent of Distributor and provided further that any such sale, assignment or transfer permitted hereunder shall expressly provide that any assignee or transferee of Supplier shall continue to provide Products to Distributor on the terms and conditions set forth herein.

5.    Supplier warrants that all Products will at all times meet the standards and criteria set forth on Exhibit D annexed hereto.  In the event that any Product is not compliant with such specifications, is recalled, or is otherwise defective, Supplier shall promptly replace such Products or shall otherwise make adjustment to any outstanding amount due to Supplier from Distributor as mutually agreed upon.  Supplier shall provide such technical Product support during the term of this Agreement as Distributor may reasonably request.

6.    Supplier covenants and agrees that all times during the continuation of this Agreement; it shall maintain general liability; product liability and such other insurance as may be requested by Distributor, in such amounts and with such insurance companies as are reasonably satisfactory to Distributor.  Supplier shall provide certificates of insurance or other evidence satisfactory to Supplier of its compliance with the insurance requirements hereof and shall cause Distributor to be a named insured under such policies.  Such policies may not be cancelled or materially modified without sixty days' prior notice to Distributor.  Distributor will also maintain additional liability insurance.

E.    **Performance Standards:**

1.    Distributor agrees and warrants that they will purchase an initial order of 100 bulk tea barrels (55 lbs. per barrel) as per pricing in Exhibit C. After 60 to 90 days upon receipt of product, parties agree to determine the applicable standard for the first year. The parties agree to determine the applicable standard 60 days prior to the end of the current year for the next year. However, the minimum increase to be 20% of the first year's standard and each subsequent year there will be a 20% minimum increase over the prior year's minimum standard.

2.    Distributor shall act to further the best image of the Supplier and Manufacturer and at no time shall the Distributor do, cause, or permit any act, or divulge, publish, or declare any information, which is or may be construed as detrimental to the best interests or business reputation of the Supplier or Manufacturer.

3.      Supplier shall provide to Distributor copies of any laboratory reports in Supplier's possession that describe the nature and quality of the product and shall provide new or updated lab reports each six months throughout the term of this agreement.

4.      Supplier shall not do, cause, or permit any act, or divulge, publish, or declare any information, which is or may be construed as detrimental to the best interests or business reputation of the Distributor. This provision shall survive termination of this Agreement for any reason.

F.      **Distributor's Purchase Orders.**

All Products ordered by Distributor hereunder shall be delivered to such locations as Distributor designates to Supplier no more than 30 days following confirmation of the order and confirmation of receipt by Supplier of letter of credit, described below, and Supplier will immediately notify Distributor that Supplier is in receipt of letter of credit. In addition to any other rights or remedies available to Distributor hereunder or otherwise, in the event that Supplier fails to deliver Products within such time period it shall pay to Distributor an amount equal to 5% of the applicable order, for every 5 day period in excess of such 30 day period that it fails to deliver the Products. Supplier represents and warrants to Distributor that it has the capacity and ability to fulfill all orders of Products placed by Distributor. Payment for Products shall be made pursuant to a letter of credit in form and substance mutually satisfactory to the parties which letter of credit shall provide among other things that the letter of credit may be drawn only upon delivery of the Products ordered to Distributor in compliance with all applicable laws to the warehouses, end-users or other facilities designated by Distributor.

G.      **Damaged Product.**

Upon delivery of Product to Distributor's warehouses or to its end-users, Distributor and/or its designated warehouses and/or its end-users shall make full inspection of delivered product. Distributor shall notify Supplier in writing of any damages or shortages of delivery of order. In the event of damages and or shortages of order, Supplier shall credit Distributor for such damages/shortages. Credit to the distributor shall be in cash reimbursement or credit toward the next order or future orders if the credit is more than the next order.

H.      **Term of Contract.**

The term of this Agreement, commencing November 22, 2006 shall continue for a period following the execution and delivery hereof and shall continue thereafter for consecutive five year terms unless sooner terminated in accordance with the terms hereof. This Agreement may be terminated by either party upon the material default of the other party unless such default is cured within thirty days after written notice thereof is received by such defaulting party. In the event of the bankruptcy, insolvency or other similar occurrence by either party, this Agreement may be terminated by the other party unless such event is stayed or dismissed within sixty days following the occurrence thereof.

I.      **Termination.**

In addition to the foregoing, the parties may terminate this Agreement as follows:

By Distributor:

- Distributor may terminate this Agreement at any time upon the occurrence of any one of the following enumerated events:

    - Supplier and/or Manufacturer is unable to make timely, adequate shipments of product.

    - Supplier and/or Manufacturer is unable to supply product of sufficient quality such that product is rendered unmarketable.

    - However, if Supplier is supplying other territories with the same products in sufficient supply and quantity, then Distributor shall be entitled to specific performance to deliver or to go directly to manufacturer if supplier refuses to supply.

By Supplier:

- Supplier may terminate this Agreement at any time following the giving of 30 days written notice to distributor upon the occurrence of any one of the following enumerated events:

    - Distributor fails to perform any material obligations under this Agreement which is not cured within 30 days after written notice to Distributor of such default.

J.    **Right of First Refusal.**

At any time that Supplier shall wish to accept an offer made by a third party for the purchase of Supplier's business, then Supplier shall give Distributor written notice of the offer and terms of payment and a copy of any proposed contract (with the proposed purchaser's name and contact information redacted) that reflects the terms of the offer. Distributor shall then have an irrevocable option for a period of thirty days after actual receipt of the notice, to purchase Supplier's business on the same terms as stated in the notice and contract.

This Right of First Refusal shall be considered validly exercised when the Distributor sends to Supplier a written notice of intent to exercise this Right of First Refusal by certified mail, return receipt requested within the thirty-day period called for above accompanied by any consideration tendered by the proposed buyer with the contract. If Distributor fails to exercise or refuses to exercise this right during the above period, Supplier may finalize the sale, exchange or other disposition to a third person or persons on the terms and conditions specified in the written notice sent to Distributor free of any rights of Distributor. However, Supplier must provide that the new Supplier adhere strictly to the terms of the Distributors agreement so as not to diminish in anyway-directly or indirectly-Distributor's rights or investment.

K.    **Chinese Manufacturer or Manufacturers and its or their affiliates Acknowledgement of this Agreement and Supplier's consent to transact directly with the Chinese Manufacturer:**

Supplier will obtain on Chinese Manufacturer's or Manufacturers' stationery signed by the owner of the Chinese Manufacturer an acknowledgement of this agreement and Supplier's granting of Distributor the right to transact directly with the Chinese Manufacturer in the event of the death of the principals of Blair Ryan Co., i.e., Jay and Fred Pelsinger. Additionally, if for any reason Supplier's contract is cancelled by the Chinese Manufacturer will state that they will transact with Distributor on the same terms as the Supplier.

L.    **Severability.**

Invalidation of one provision of this Agreement shall not invalidate the entire Agreement; rather, the remaining clauses shall survive intact.

M.    **Alternative Dispute Resolution.**

This Agreement shall be governed by the laws of the State of Delaware. Distributor and Supplier both agree to submit any and all unresolved disputes hereunder first to mediation in Delaware, Delaware, and if the results of such mediation are unsuccessful, then the parties agree to submit their claims to binding arbitration in Delaware, Delaware according to the rules of the American Arbitration Association. Supplier and Distributor shall each appoint one arbitrator and the two arbitrators will agree to appoint a third arbitrator. Either party can commence arbitration if mediation is unsuccessful.

N.    **Completeness.**

The parties hereto agree that this Agreement as it may subsequently be amended as provided below is the sole and exclusive embodiment of the agreement between the parties with respect to the subject matter hereof.

O.    **Modification/Amendments.**

Any and all modifications or amendments to this Agreement shall be in writing and signed by both parties. No oral modifications are effective or enforceable by or against either party. Modifications and amendments may be executed via facsimile transmission or similar electronic transmission means.

P.    **Force Majeure.**

Neither Supplier nor Distributor shall be liable to the other for any failure to perform any obligation under this contract due to acts of government, civil authority, strike or acts of God. The party claiming relief under this subsection shall give prompt written notice to the other party. The remedy for such an event, except as otherwise provided herein, is not termination of the Agreement, but rather the Agreement shall be extended by an amount time equal to the length of delay attributable to such occurrence.

Q.    **Additional Items.**

1.    Attached hereto is a true and complete copy of the commercial contract by and between Supplier and Xi'an Jinguishou Pharmaceutical Factory No. 42 ("Xi'an") dated May 27, 2005 which agreement is in full force and effect. Supplier shall promptly provide to Distributor copies of any amendment to such agreement Supplier represents, warrants and covenants to Distributor that such agreement (as the same may be amended from time to time) will not be violated by the execution and delivery hereof and that no consent of Xi'an is required in connection with the execution and delivery hereof and that Supplier has full power and authority to grant to Distributor the rights granted to it hereunder.

2.    In the event that Supplier elects by written notice thereof to Distributor to use or co-brand with any trademark, packaging or other branding materials of Distributor, the parties shall use their best commercial efforts to enter into a mutually agreeable licensing and cross-branding agreement with respect thereto as promptly as practicable after the receipt of Supplier's notice to Distributor; provided, however that Supplier may not use any trademark or other materials of Distributor unless and until such license agreement is entered into.

3.    All notices or other communications required or permitted to be given hereunder or contemplated hereby shall be in writing and shall be given to the other party at its address set forth below either by hand delivery, facsimile or recognized national overnight courier service;

> If to Supplier, to;
> Blair Ryan Co.
> 7321 N.W. 18 Street
> Suite 201
> Margate, Florida 33063

> If to Distributor, to;
> Gary Spirer
> GS Equities Ltd.
> 161 W. 61st Street, Suite 23E
> New York, New York 10023

4.    Each party agrees to cooperate fully with the other in connection with the matters contemplated hereby and to execute and deliver, and take all such other actions as may be reasonably necessary to further implement the terms of this Agreement. In furtherance thereof, Supplier shall do all things as may be reasonably necessary or requested by Distributor to further the purposes hereof including but not limited to cooperating with or making any necessary applications to any applicable governmental authority in obtaining any permits or other approvals required thereby.

5.    Supplier shall promptly notify Distributor upon receipt of notice or other information which should reasonably lead Supplier to conclude that any manufacturer of Products has suffered any interruption in production, has entered into a merger, sale or other distribution of its assets or equity, any rule or regulation has become applicable preventing or impeding the delivery of Products to or within any of the Territories or any other fact or

circumstance which could reasonably be expected to adversely affect the rights of Distributor hereunder.

6.    This Agreement may not be assigned or delegated by either party except that Distributor shall have the right to assign its rights and obligations hereunder in whole or in part.

7.    This Agreement may be executed in counterparts, all of which when taken together shall be deemed one original. This Agreement may only be amended or modified by written instrument executed by each of the parties hereto.

If the foregoing accurately reflects your understanding, kindly execute this Agreement where indicated whereupon it will become a binding agreement between us.

GS EQUITIES, LTD.

By: _____
Name:
Title:

AGREED TO:

BLAIR RYAN CO., INC.

By: _____
Name:
Title:

Date: January 12, 2007

## Exhibit A

### Products

As used in this Agreement, "Products" means any combination of existing or newly developed ingredients, singly or in combination, in any format now or in the future and any state or medium such as frozen, freeze dried, liquid, gas or solids including granular, pills, tablets or liquids on account of any (1) sexual or energy enhancement products including but not limited to Herbal Zisen Products (tablets, capsules), tea as the same may be added or used in an alcoholic or non-alcoholic beverage of any kind.

### Specifications

Specifications for each of the Products shall be listed and made a part of this agreement. Any changes to the Product specifications must be agreed to by the Distributor.

## Exhibit B

## Territory

Distributor is hereby granted the exclusive right to market, sell and distribute in any manner whatsoever any of the Products now or hereafter developed anywhere in the world.

## Exhibit C

### Pricing to Distribution Contract

| Quantity | Jinshenkang Granule |
|----------|---------------------|
| 500kg or less | USD 132.00/kg |
| 501kg to 1000kg | USD 127.00/kg |
| 1001kg or more | USD 122.00/kg |

## Exhibit D

### Standards and Criteria